## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHRISTINE MORRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 10-414-LPS-CJB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **REPORT AND RECOMMENDATION**

Plaintiff Christine Morris ("Morris" or "Plaintiff") appeals from a decision of defendant

Michael J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying her

application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 401-433. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Morris and the Commissioner.[1] (D.I. 14, 18) Morris asks the Court to reverse the

Commissioner's decision and order benefits or remand for further proceedings. (D.I. 15) The

Commissioner opposes this motion and requests that the Court affirm his decision. (D.I. 19) For

the reasons set forth below, the Court recommends that (1) Plaintiff's motion for summary

judgment be GRANTED-IN-PART; (2) the Commissioner's motion for summary judgment be

---

[1]     With regard to a motion for summary judgment filed pursuant to Fed. R. Civ. P.
56, absent unanimous consent of the parties to the jurisdiction of a United States Magistrate
Judge, a Magistrate Judge's authority as to the resolution of the motion is limited to making a
Report and Recommendation to the District Court. 28 U.S.C. § 636(b)(1)(B); D. Del. LR
72.1(a)(3).

1

DENIED without prejudice; (3) the Administrative Law Judge's ("ALJ") decision be

VACATED; and (4) this matter be remanded to the ALJ for further proceedings consistent with

this opinion.

## I.    BACKGROUND

### A.    Procedural History

Morris filed her claim for DIB on June 25, 2004, alleging disability beginning on

December 31, 2002. (D.I. 6 & 7 ("Transcript" and hereinafter "Tr.") at 124-27; D.I. 15 at 1) Her

claimed period of disability runs through December 31, 2007, the date she was last insured for

disability benefits. (Tr. at 27, 70, 72)

Morris' application was denied initially on September 8, 2004, and was again denied on

reconsideration on June 1, 2005. (Tr. at 92-96, 101-05) On June 23, 2005, Morris filed a request

for a hearing before an ALJ. (Tr. at 106) The hearing, before ALJ Judith A. Showalter, was held

on March 7, 2007. (Tr. at 1303-57) On August 15, 2007, the ALJ issued a decision confirming

the denial of benefits to Morris. (Tr. at 67-80)

On August 23, 2007, Morris requested a review of that decision by the Appeals Council.

(Tr. at 66) In response to Morris' appeal, on October 31, 2008, the Appeals Council vacated the

ALJ's hearing decision and remanded the case, ordering the ALJ to resolve the following two

issues:

[1] The [ALJ's] hearing decision, pages 4 and 5, found that the claimant could perform
sedentary work that involved, among other restrictions, "handling, fingering, and feeling
limited to frequent rather than continuous." However, the decision, page 9, gave
significant weight to the May 2, 2007 consultative examination by David Archer, M.D.,
who concluded that, among other restrictions, the claimant could occasionally reach,
handle, finger and feel with both hands []. Further assessment is needed.

2

[2] New evidence has been received. On August 8, 2007, Frank Falco, M.D., the claimant's treating pain management physician, concluded that the claimant "can't sit, stand, walk for more than ½ - 1 hour at a time", "would also need to take frequent breaks (about 15 min every 45 min)", "couldn't work a 40 hour work week", and "this started about 4 years ago." Dr. Falco also stated the claimant has multiple sclerosis and lupus. An assessment of this opinion is needed.

The Appeals Council ordered the ALJ, *inter alia*, to "[g]ive consideration to the treating and nontreating source opinions pursuant to [Social Security regulations and rulings] and explain the weight given to such opinion evidence," and give "further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with references to evidence of record in support of the specific work-related limitations." (Tr. at 119-20)[2]

On August 13, 2009, the ALJ held another hearing (Tr. at 1358-86), and on October 21, 2009, the ALJ again issued a decision denying Morris' claim (Tr. at 24-56). Morris again requested a review of this decision by the Appeals Council, but that request was denied on April 6, 2010. (Tr. at 10-13) The October 21, 2009 decision therefore became the final decision of the Commissioner. (Tr. at 10); *see also* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On May 18, 2010, Morris filed a Complaint in this Court seeking judicial review of the ALJ's October 21, 2009 decision. (D.I. 1) On November 23, 2010, Morris filed her motion for summary judgment. (D.I. 14) The Commissioner opposed Morris' motion and filed a cross-motion for summary judgment on January 20, 2011. (D.I. 18) On August 29, 2011, this case was referred to me to hear and resolve all pretrial matters. (D.I. 29)

---

[2]     Morris had filed a subsequent application for Title II benefits on August 28, 2007; the Appeals Council ordered that this new claim be associated with Morris' prior claim and that a new decision be issued on the associated claims. (Tr. at 119-20)

## B.    Factual Background

At the time of the alleged onset of her disability in December 2002, Morris was 41 years old; she was 46 years old as of the date last insured in December 2007. (Tr. at 55) She has a high school education (Tr. at 142, 1371), and she was last employed in December 2002, when she worked as a cocktail waitress (Tr. at 137, 1372). During the relevant period in this case, Morris lived with her husband, who was employed, and with her son (who was 12 years old in 2007). (D.I. 1309, 1331)

### 1.    Plaintiff's Medical History, Treatment, and Condition

Morris alleges that she became disabled on or about December 31, 2002, following surgery on her neck. (Tr. at 1372) She asserts that she remains unable to work due to pain in her arms, back, legs and neck, and due to her diminishing eyesight. (Tr. at 136) Morris claims that her pain and her inability to work stem from a number of medical problems, including: (1) cervical degenerative disc disease and radiculopathy; (2) right trochanteric bursitis; (3) osteoarthritis; (4) vision loss; (5) lupus; (6) lumbar degenerative disc disease; (7) carpal tunnel syndrome; (8) depression and anxiety; (9) irritable bowel syndrome; and (10) headaches. (Tr. at 30-41) Morris' relevant medical history is significant in scope, spanning many years.

#### a.    2000–2002

Beginning in October of 2000, prior to the onset of her alleged disability, Morris sought treatment for pain in her neck and arm from the doctors at Mid-Atlantic Spine and Pain Physicians ("Mid-Atlantic"), including Frank Falco, M.D., Michael Lepis, M.D., Reema Malhotra, M.D., and Rachel Smith, D.O. (Tr. at 606-07) In May of 2002, an MRI indicated a cervical spondylosis (arthritis), bulging, and spur formation in Morris' spine. (Tr. at 476) Morris

4

was treated with pain medications, which provided some improvement but did not resolve her sharp, "knife-like" pain. (Tr. at 466)

In August of 2002, Morris also began to complain of right lateral hip and thigh pain, which had begun a month before. (Tr. at 456) This pain was diagnosed as right trochanteric bursitis. (Tr. at 457) Morris was given corticosteroid injections in August and November 2002; these injections provided initial relief, but Morris' pain later returned. (Tr. at 432, 436, 450)

On October 1, 2002, Dr. Frank Hermantin, who diagnosed Morris with cervical spondylosis and foraminal stenosis, performed surgery on Morris in an attempt to alleviate her neck and arm pain. (Tr. at 243) Dr. Hermantin performed an anterior C-6 nerve root decompression, anterior cervical interbody fusion C5-6 and application of an anterior plate. (*Id.*) Dr. Hermantin advised Morris not to return to work until December 6, 2002, and then to lift no more than 10-20 pounds. (Tr. at 266-67)

At her first post-operative visit, Morris reported to Dr. Hermantin that her right hand pain and numbness had resolved completely and that she had been using the computer without difficulty. (Tr. at 260) However, her shoulder pain and neck discomfort continued and Dr. Hermantin treated it with a lidocaine injection. (*Id.*) At a follow-up visit with Dr. Hermantin on December 19, 2002, Morris indicated that her upper extremity pain had resolved and that the fact that she discontinued working as a waitress helped. (Tr. at 258) A few days later, however, on December 23, 2002, Morris returned to see Dr. Smith, where Morris reported continued pain in her arm, shoulder and hip and said that her medications were providing 80% pain relief. (Tr. at 432) Morris told Dr. Smith that Dr. Hermantin had encouraged her to discontinue work, but Morris had returned to work instead. (*Id.*) However, now believing that the return to work was

5

exacerbating her pain, Morris said she was going to put in her two-weeks notice and cease working for the next year to allow for healing. (*Id.*)

**b. 2003**

On February 12, 2003, Morris underwent electrodiagnostic testing of her right upper extremities and related paraspinal muscles to evaluate continued pain, but the study was unremarkable. (Tr. at 423) Yet in visits to Dr. Falco and Dr. Smith in early 2003, Morris reported that sharp right arm, neck and leg pain had returned. (Tr. at 404, 409, 418) During these visits, Morris noted that she had difficulty doing chores such as vacuuming, said that her symptoms were "pretty much back to where they were before the [October 2002] surgery," and that her medication reduced those symptoms by only 50%. (Tr. at 404, 409)

On May 15, 2003, Dr. Smith again examined Morris. Dr. Smith noted that an MRI of Morris' right shoulder was essentially normal. (Tr. at 399) However, she summarized all of the procedures that Morris had undergone over the last two years to relieve her back, neck, arm and shoulder pain, "none of [which] subsequently provided any relief," leaving Morris "frustrated." (*Id.*) Dr. Smith thus recommended that Morris simply continue with chronic pain management, as medications were providing her with 60% pain relief at the time. (*Id.*) Dr. Smith suggested lifestyle and work modifications along with exercise and medication. (*Id.*) Her diagnosis was that Morris suffered from chronic neck and right arm pain post C5-C6 fusion, cervical spondylosis, cervical myofascial pain, right C6 radiculopathy and right trochanteric bursitis. (Tr. at 400)

Beginning on December 1, 2003, Morris began to complain of headaches in addition to her other symptoms, which had continued with "absolutely no change." (Tr. at 389) Dr. Falco

6

reported that the headaches sounded classically occipital in nature. (*Id.*) His exam also noted

that Morris had slightly decreased range of motion of the cervical spine with flexion/extension,

positive significant trapezius tenderness on the right, pain on palpation over the scapular area and

right-sided cervical facet tenderness, as well as cervicothoracic posterior element tenderness.

(*Id.*) A December 29, 2003 follow-up with Dr. Falco showed similar results. (Tr. at 384)

### c.     2004

In February 2004, Dr. Falco reported that SI joint injections and cervical facet joint nerve

blocks were recommended, but that Morris preferred not to have any procedures. (Tr. at 381)

She reported that she was being worked up for Hodgkin's disease or tuberculosis by physicians in

Philadelphia. (*Id.*)

Later that month, on February 24, 2004, Morris was examined by Carl H. Park, M.D.,

who performed a retinal evaluation. (Tr. at 276-77) Dr. Park noted that Morris had decreased

vision in her left eye for at least a year and longstanding eye inflammation; he diagnosed Morris

with generalized retinal vasculitis with secondary vitritis, cystoid macular edema in the left eye,

and posterior subcapsular cataracts, which were greater in the left eye than the right eye. (*Id.*) In

April of 2004, Morris reported to C. Obi Onyewu, M.D., at Mid-Atlantic that she had been

diagnosed with rheumatoid arthritis approximately one month before and that an ophthalmology

consultation resulted in a diagnosis of iridis for which she required steroid drops to her left eye.

(Tr. at 377) She further reported that the ophthalmologist thought her eye problem was

secondary to multiple sclerosis, not rheumatoid arthritis. (*Id.*)

Morris began seeing rheumatologist Sheerin Javed, M.D., beginning in May of 2004, in

order to determine the cause of her eye problems and other joint complaints. (Tr. at 345)

7

Following examination, Dr. Javed noted that she found no evidence of a systemic autoimmune disease but ordered additional tests. (Tr. at 346) Morris saw Dr. Javed on multiple other occasions in June and July 2004. After these visits, Dr. Javed concluded that while Morris suffered from lower back pain, a tender spine and hand pain, she did not appear to have synovitis or meet the criteria for lupus or any spondyloarthropathy. (Tr. at 343) As of July 2004, Morris showed no evidence of restricted range of motion at the C-spine or lumbar spine and a full range of motion at the hips and knees. (Tr. at 341)

On September 4, 2004, Ann C. Aldridge, M.D., a state agency medical consultant, prepared the first of many Physical Residual Functional Capacity ("RFC") Assessments in the record regarding Morris. Her assessment was based on a review of Morris' medical record. Dr. Aldridge found that Morris could lift 20 pounds occasionally and 10 pounds frequently, that she could stand and/or walk for a total of about 6 hours in an 8-hour work day and could sit for a total of about 6 hours in an 8-hour work day. (Tr. at 299) She also found that Morris had, among other limitations: (1) the inability to climb a ladder, rope or scaffold; (2) limited ability to reach in all directions; and (3) multiple visual limitations in one or both eyes. (Tr. at 299-302) After reviewing Morris' medical history to date, Dr. Aldridge concluded that Morris could return to light work, with certain limitations. (Tr. at 300) Dr. Aldridge found that Morris had "overstate[d]" the severity of her illness," in that, *inter alia*, Morris' claimed limitations on the ability to walk were not supported by the records, her claimed visual limitations were belied by the fact that Morris reported spending time reading and doing puzzles, and her claimed writing limitations were contradicted by the fact that she had filled out various medical questionnaires. (Tr. at 303)

8

#### d.    2005

By January of 2005, Dr. Javed changed Morris' diagnosis to systemic lupus erythematosus ("SLE") with positive anti-nuclear antibodies, anti-histone antibodies, low complements, arthralgias, fatigue and rash. (Tr. at 339) Dr. Javed started Morris on Arava (leflunomide), a drug used to treat rheumatoid arthritis. (*Id.*) In March 2005, Morris reported to Dr. Javed that the Arava was not working, noting that although her eyes felt better, her legs felt worse. (Tr. at 338) Dr. Javed advised Morris to give the Arava more time and increased the dose. (*Id.*)

On March 29, 2005, Morris reported to Dr. Falco that her pain was present "all down her legs and back . . . all the time," that "everything makes it worse[,]" but that medication has helped. (Tr. at 775) She rated her pain as 5-6 on a scale of 10. (*Id.*) She told Dr. Falco she felt she was getting worse and weaker, had difficulty going up stairs and walking for any distance. (*Id.*) Dr. Falco scheduled a lumbar epidural and continued a prescription for pain medication. (*Id.*)

Morris had continued to receive eye care since 2004 from various physicians, including Dr. Gregory Smith and Dr. Charles Wang. After providing Morris therapy and injections through early 2004, in February 2005, Dr. Gregory Smith reported that while Morris had a blind spot in her left eye, her vision fields in both eyes had improved. (Tr. at 310) Similarly, on April 12, 2005, Morris reported to Dr. Wang that her left eye vision had improved. (Tr. at 1191-92) At that time, vision in her right eye was 20/25 and vision in her left eye was 20/60, which Dr. Wang categorized as a major visual improvement. (*Id.*) In May 2005, Robert C. Sergott, M.D., an eye surgeon, evaluated Morris and found that her vision loss was primarily due to maculopathy (a

9

retinal condition) and that her visual acuity was 20/25 in the right eye and 20/100 in the left. (Tr. at 611-12)

On May 25, 2005, Vinod Kataria, M.D., a state agency physician, performed an RFC assessment based on a review of the record, concluding that Morris could perform a limited range of sedentary work. (Tr. at 613-22) Specifically, Dr. Kataria found that Morris could lift 10 pounds occasionally and less than 10 pounds frequently, could stand and/or walk for at least 2 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull without limitation except with certain restrictions for lifting and carrying. (Tr. at 614) Dr. Kataria also found, *inter alia*, that Morris (1) had an unlimited ability to reach in all directions and to handle, finger and feel; and (2) had visual limitations with respect to depth perception and field of vision. (Tr. at 615-17)

In visits to Dr. Javed in August and September 2005, Morris reported depression, as well as continued problems with her vision. (Tr. at 1132, 1134) Dr. Javed noted no evidence of synovitis and found that Morris had a full range of motion in her shoulders, hips, and knees. (*Id.*)

### e. 2006

On January 16, 2006, the results of a nerve conduction study performed on Morris were abnormal. Though the study showed no findings for cervical motor radiculopathy, peripheral polyneuropathy, or myopathy, it did show findings consistent with a diagnosis of carpal tunnel syndrome and did not rule out the possibility of a sensory radiculopathy. (Tr. at 823)

During a February 23, 2006 visit with Dr. Javed, a physical exam again showed no evidence of synovitis in the small joints of the hands, wrists, elbows, knees, ankles, or feet. (Tr. at 629) It further showed that Morris had a full range of motion of her cervical and lumbar spine.

10

(*Id.*) At an April 2006 exam, Morris reported to Dr. Javed that she had swollen knees and due to her bad vision, had recently tripped over some stairs and fell; Morris said that she did not feel that the Arava was working with respect to her fatigue and joint pain. (Tr. at 627) An examination by Dr. Javed revealed tenderness on palpation across the dorsum of both wrists as well as on palpation of the knees across the medial and lateral joints. (*Id.*) Dr. Javed advised Morris to lower her dose of Arava and started her on Cytoxan (an immunosuppressive drug), which helped ease Morris' pain a bit as the year wore on. (Tr. at 625, 627) On May 10, 2006, an ultrasound of Morris' knees was performed, which showed mild cartilage narrowing of the left knee and a normal right knee. (Tr. at 816)

On October 26, 2006, Dr. Wang reported that the vision in Morris' right eye was 20/50 and was such that she could "count fingers 1 foot" with her left eye. (Tr. at 1190) He concluded that Morris' uveitis (swelling and irritation in the middle layer of the eye) was under control with Cytoxan, and that "most likely her left eye vision will remain poor." (*Id.*) Morris' vision remained this way through early 2007. (Tr. at 824)

Between July and November of 2006, Morris visited Dr. Falco monthly. In July and August, she reported the pain in her legs, back and hands as increasing to a 7-8 on a scale of 10. (Tr. at 1077, 1081) Dr. Falco changed Morris' pain medication, substituting a Duragesic patch for the previously prescribed lidoderm patch in July and increasing the dosage in August when Morris continued to complain of severe pain. (Tr. at 1076-80) In September and October of 2006, Morris lowered her pain rating in these areas to a 5-6 out of 10, but still complained of severe pain. (Tr. at 1070-76) On November 22, 2006, Morris returned to Dr. Falco's office and reported that her bilateral wrist pain had significantly decreased following injections, but that her

11

back and leg pain remained severe, though better with medication. (Tr. at 1068-69) Dr. Falco's exam revealed that Morris' gait was coordinated and smooth and her muscle strength and tone were normal (Tr. at 1069), but that she had moderate lower back spasms and moderate pain on palpation in the same area (Tr. at 1068). He recommended additional lumbar epidural injections. (Tr. at 1069)

### f.    2007

In January of 2007, Morris saw Dr. Javed, reporting that her lupus had flared for the preceding two or three months, and noting a rash on her face, achy joints, and hot flashes. (Tr. at 1119) She stated that she had reduced her dosage of Cytoxan as she could not tolerate it, and she stopped taking Arava. (*Id.*) A physical examination revealed mild flush on Morris' face and nose, no evidence of synovitis and that Morris was able to make tight fists with both hands. (*Id.*) Her primary diagnosis remained SLE. (*Id.*)

At her March 2007 visit with Dr. Falco, Morris reported increased pain and requested bilateral carpal tunnel and right fifth trigger finger injections. (Tr. at 1226) At her follow-up visit in April, Morris reported that the injections had provided her with 80% pain relief to her wrist and hand pain, but said that her lower back pain was worse. (Tr. at 1224) She indicated she wanted to continue with her current pain regimen, but possibly have a lumbar epidural in a few months. (*Id.*)

At her April 2007 visit to Dr. Javed, Morris reported having "a lot of aches in both legs" and complained of worsening of her ocular symptoms. (Tr. at 1117) Dr. Javed's exam revealed no new results, except that Morris' facial rash had improved. (*Id.*)

On May 2, 2007, Donald R. Archer, M.D., examined Morris for the purposes of Morris'

12

disability application. (Tr. at 825-26) Dr. Archer noted that Morris could walk without an assistive device and had a normal gait, but was wearing wrist braces bilaterally, a right locked knee brace and an elastic sleeve on her left knee. (*Id.*) Though he did not detect any significant muscle wasting, Dr. Archer did note that Morris had difficulty lifting her arms above shoulder height for both abduction and for forward flexion. (Tr. at 826) She was able to move her arms further in passive range of motion for abduction, but then complained of pain when he stopped moving her shoulders in that direction. (*Id.*) Her elbows, wrists and fingers appeared to be in normal range of motion. (*Id.*) Her lower extremities had normal muscle bulk, but she had tenderness about the knees, worse on the right than the left. (*Id.*) She had full range of motion in her knees, but mild weakness throughout her lower extremities due to pain. (*Id.*) An examination of her back revealed some flattening of the lumbar lordosis and increased thoracic kyphosis. (*Id.*) She was able to bend 60 degrees at the waist, had 10 degrees of lumbar extension and 20 degrees of lateral flexion, but had increased pain with all of these maneuvers. (*Id.*) She had normal motion in her cervical spine for forward flexion, but had approximately 80% of lateral flexion and only 50% of rotation on her cervical spine bilaterally. (*Id.*)

In his assessment, Dr. Archer wrote that Morris' disability was primarily related to her pain syndrome. (Tr. at 826) He indicated that she did not tolerate much activity and her abilities would be limited to light duty to sedentary activities. (*Id.*) Dr. Archer noted that, by the history she gave, Morris would not tolerate repetitive activities with her upper and lower extremities. (*Id.*) He found that she had no contraindications to sitting, but may need frequent changes of position. (*Id.*) Dr. Archer noted that Morris stated that she only drove short distances and that he was not able to test her eyesight, which would need to be taken into account in assessing her

13

driving ability. (*Id.*) He stated that Morris' musculoskeletal system did not demonstrate any abnormalities due to her physical exam and that there was no significant derangement in the joints of her upper or lower extremities. (*Id.*) He further noted that Morris had some mild-to-moderate restrictions in range of motion in her shoulders and neck, with the latter being related to prior surgery. (*Id.*)

Following the examination, Dr. Archer completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) form. (Tr. at 827-32) He concluded that Morris could lift up to 20 pounds occasionally and carry up to 10 pounds occasionally. (Tr. at 827) She could sit for up to 2 hours at a time but not more than 4 hours total per 8-hour day, could stand and walk for up to 2 hours at a time and not more than 3 hours per 8-hour day. (Tr. at 828) Dr. Archer also found, *inter alia*, that Morris: (1) could occasionally reach, handle, finger and feel; and (2) could occasionally climb stairs and ramps, balance, stoop, kneel and crouch, but never climb ladders, scaffolds or crawl. (Tr. at 829-30)

Between May and August of 2007, Morris visited Dr. Falco monthly, as usual. Morris reported continued pain in her back, hip and legs, noting that medication was only providing partial relief. (Tr. at 1216, 1219) Dr. Falco performed a left hip bursa injection. (Tr. at 1213) During this time, Morris' pain remained the same for the most part, but grew in her lower back. (Tr. at 1203-16)

On August 8, 2007, Dr. Falco completed an RFC form. (Tr. at 833-35) He concluded there that, in an 8-hour workday, Morris could only lift or carry up to 5 pounds frequently, could stand or walk for a total of 2-3 hours per day, sit for a total of 2-3 hours per day, would need to lie down for 1-2 hours per day, would need to elevate her legs for 1-2 hours per day, and would

14

need at least a 15-minute break every 45 minutes to an hour. (Tr. at 833) He stated that Morris' pain would cause her to miss 10-12 days of work per month and to miss at least one hour of work 18-20 days per month. (Tr. at 834) Dr. Falco also noted that Morris could occasionally twist, crouch/squat, handle, finger, feel, push and pull, but that she could only rarely reach, stoop, or climb stairs, and could never climb ladders. (*Id.*) Ultimately, in light of these severe limitations, Dr. Falco concluded that Morris was incapable of performing even sedentary work on a regular and continuing basis. (Tr. at 835)

On November 21, 2007, Robert Palandjian, D.O., a state agency physician, performed an RFC assessment based upon his review of the record. (Tr. at 1229-35) He concluded that Morris could frequently lift or carry 10 pounds, stand and/or walk for a total of 6 hours in an 8-hour work day, and could sit for a total of 6 hours in an 8-hour work day. (Tr. at 1230) Dr. Palandjian, among other findings, noted that Morris: (1) could occasionally climb a ramp or stairs, but could never climb a ladder, rope or scaffold; (2) had an unlimited ability to handle, finger and feel but a limited ability to reach (specifically noting that "occasional" reaching would be possible, but not frequent or continuous reaching); and (3) was visually limited in all respects. (Tr. at 1231-32) Dr. Palandjian noted that, based upon "preserved motor strength and independent gait with chronic pain," Morris should be "capable of sustaining light activity with visual/hazard restrictions." (Tr. at 1234)[3]

On December 17, 2007, Frederick Kozma, Ph.D., personally examined Morris and performed a psychological evaluation for the purposes of Morris' disability claim. (Tr. at 1236-

---

[3]     Dr. Palandjian's assessment was further reviewed and affirmed by Jose Acuna, M.D., a state agency physician, on March 11, 2009. (Tr. at 1267)

40) Dr. Kozma noted that Morris appeared credible and found that Morris suffered from Major Depressive Disorder, manifested by sad affect, feelings of hopelessness, low self esteem, difficulties with memory and concentration and thoughts of death. (Tr. at 1236-40) He opined that, as a result, she had more than moderate limitations in many areas relating to her ability to interact with others and to perform job-related tasks. (Tr. at 1241-42)

### g.    2008

On January 2, 2008, Carlene Tucker-Okine, Ph.D, a state agency psychological consultant, completed a mental RFC assessment based on her evaluation of the record evidence. (Tr. at 1254-55) Dr. Tucker-Okine noted that Morris was moderately limited in her ability to perform certain tasks, and that, otherwise, Morris was not significantly limited. (*Id*.) Dr. Tucker-Okine noted that Morris was "only somewhat credible," and that she presented with only mild cognitive impairment as her "problems appear to be largely physical." (Tr. at 1256)[4]

On January 11, 2008, Henry Scovern, M.D., a state agency medical consultant, reviewed Dr. Palandjian's physical RFC assessment for the Disability Determination Service ("DDS"). (Tr. at 1257-59) In doing so, Dr. Scovern also took note of Dr. Falco's August 2007 RFC opinion. (Tr. at 1257) Although agreeing that Morris' allegations were consistent with Dr. Falco's findings, Dr. Scovern also noted that Dr. Falco's examinations "did not report the

---

[4]      On January 22, 2008, Hillel Raclaw, Ph.D., a state agency psychological consultant, reviewed the mental RFC assessment completed by Dr. Tucker-Okine. Dr. Raclaw agreed with Dr. Tucker-Okine's conclusions and found that Dr. Kozma's conclusions were not supported by the weight of the evidence. (Tr. at 1263-65) Dr. Raclaw further noted that although Morris did evidence depression, she was able to concentrate, her memory was intact and she was not distractible. (Tr. at 1265) On March 11, 2008, Pedro M. Ferreira, Ph.D, a state agency psychological consultant, affirmed Dr. Tucker-Okine's assessment as written. (Tr. at 1266)

appearance of pain" and that notes from Morris' rheumatologist could be interpreted as either consistent or inconsistent with Dr. Falco's conclusions. (*Id.*) As a result, Dr. Scovern found that "the file contained neither definitive evidence for nor definitive evidence against the allegations." (*Id.*) Dr. Scovern did note, however, that, given Morris' persistent allegations of pain since 2000, and her consistent use of narcotics, Dr. Falco's statement that Morris could not sustain the routine of a full work week carried "substantial weight according to program policy and guidelines" and that he "would have assigned a less-than-sedentary RFC." (*Id.*) Yet he also found that "[n]evertheless, [Dr. Palandjian] properly considered all the same evidence and reached a different conclusion which cannot be considered patently incorrect. There is no authority at this review level to substitute judgment. Therefore the RFC is accepted as written." (*Id.*)

## 2. The Administrative Hearings

Morris testified at two administrative hearings. The first was on March 7, 2007 (the "First Administrative Hearing"), and the second, after remand by the Appeals Council, was on August 13, 2009 (the "Second Administrative Hearing"). (Tr. at 1304-57, 1360-86)

### a. The First Administrative Hearing

#### i. Ms. Morris' Testimony

At the First Administrative Hearing, Morris testified that she has a twelfth grade education and that she most recently worked as a cocktail waitress, which involved standing and walking all day and lifting approximately 10 pounds throughout the day. (Tr. at 1310) She became unable to work as of the end of December of 2002, when she said her legs and arms had become very weak following her neck surgery. (Tr. at 1311) She has not worked for pay since

17

that time, as her impairments, particularly lupus, had prevented her from doing so. (Tr. at 1311-12) Morris testified that her most significant health problem is chronic pain in her legs and arms, which is worsened by standing and walking. (Tr. at 1312) She said that her doctors do not know what part of her body causes that pain. (*Id.*)

Morris said that, at the time of the hearing, she was not receiving treatment for her back, but that she was going to reschedule treatment. (Tr. at 1313) Morris indicated that she had stopped treatment for her back because the injections lasted for about a year, but admitted her most recent injection was more than two years prior. (*Id.*) She testified she currently had pain in her lower back about once a week, which she treated with oxycodone. (Tr. at 1313-14) When taking that medication, on an average day, she said her back pain was about a five on a scale of one to ten. (Tr. at 1314)

With regard to her neck, Morris testified that her late-2002 surgery helped for about two years, but that, as of the hearing "everything has come back." (Tr. at 1314) She further testified, however, that she was not in treatment for her neck at the time of the hearing because she had no pain in that area and could move her head freely. (*Id.*)

Morris testified that her carpel tunnel syndrome was detected in 2006. (Tr. at 1315) She treated that ailment with oxycodone and by wearing splints approximately 24 hours a day. (*Id.*) When taking the medication, on an average day, Morris testified that her wrist pain was about a four on a scale of one to ten. (Tr. at 1316) Morris further testified that her dexterity was limited, such that she had a hard time zippering or fastening things, and required help from others to do those things. (*Id.*) She described being able to hold some items (a fork, a toothbrush, a cup) for a short time, but not others (a hairbrush). (*Id.*) She said she could use a pen for brief tasks (like

18

signing her name, or writing a check), but not for longer tasks such as making out a grocery list, which would cause her hand to go numb. (Tr. at 1317, 1336) She had a computer, but could not use it for more than 30 seconds before her hand froze up. (*Id.*) She was able to open a doorknob or car door "with a little strength" and could hold a car steering wheel "very lightly." (Tr. at 1317)

Morris testified that she began receiving treatment for pain in her knees sometime in early 2006. At that time she went to Dr. Falco, who did ultrasounds and discovered torn cartilage and ligaments in both knees. (Tr. at 1318) Dr. Falco referred Morris to a surgeon who suggested injections once a week for six weeks, which provided only temporary relief. (*Id.*) As of the hearing, she was not receiving treatment because she had to wait six months before she could receive injections again. (*Id.*) In the meantime, she was wearing braces on both knees. (*Id.*) When she took pain medication, she would rate her knee pain at about a two on a scale of one to ten. (Tr. at 1319)

With respect to her eyes, Morris described the treatment she had received since 2004, including cataract surgery and steroid injections. (*Id.*) As of the hearing, she was treating her eye problems with steroid eye drops. (*Id.*) Morris testified that she had no vision in her left eye, and some vision in her right, which was compromised by inflammation. (Tr. at 1320, 1340-41) She had no limitations on her driver's license, other than that she wear glasses, and she was able to see well enough to read a book or watch television. (Tr. at 1320) Her lack of vision in the left eye caused her to be particularly cautious when walking and to need to turn her head to see things on her left side. (Tr. at 1320-21)

As for her lupus, Morris testified that it causes her pain all of the time in her legs, back

19

and arms and causes her to be very tired. (Tr. at 1321-22) She treated this with Cytoxan, which was not providing much relief. (Tr. at 1322) Morris also testified that it was her lupus that was causing her to lose her vision and that Dr. Javed was particularly concerned with this issue. (Tr. at 1339, 1343)

After testifying about a few other ailments, including depression (Tr. at 1324), Morris explained how all of her ailments limit her physical abilities. She said that she was only able to walk for a few minutes at a time, could not use the stairs, could only stand for about 10 minutes before her legs gave out, and could only sit for about 15 minutes. (Tr. at 1326) She testified that she could not lift anything heavier than a cup of soup. (*Id.*). Morris said that she could not bend forward at the waist, could not kneel, and could not pick something up off of the floor. (Tr. at 1327) Morris testified that she had trouble staying focused, that spelling and math was difficult for her, and that she could not deal well with strangers. (*Id.*) She testified that she was only able to sleep about five hours a night, and that it took her several hours to get out of bed in the morning after taking her pain medication. (Tr. at 1328-29, 1332) She said she needed assistance to get into the bathtub and that, over the last six months, she had needed help with some aspects of dressing, such as manipulating buttons or putting on socks and shoes. (Tr. at 1328-29, 1334) She could no longer take a shower because her legs would give out, and could not cook for herself, do the household chores or the laundry, do grocery shopping or attend school events for her son. (Tr. at 1329-30, 1333-35) Morris said she was able to drive a short distance to the drugstore, but relied on her husband and friends to take her to doctor's appointments and other places. (Tr. at 1330) Morris noted that she belonged to no social clubs or groups, and said that nearly the entirety of her daily routine involved sitting in bed, reading

20

books and doing puzzles. (Tr. at 1331-32)

## ii. The Vocational Expert's Testimony

Vocational expert Adina Leviton also testified at the First Administrative Hearing. She stated that Morris had performed light, semiskilled work at times during the 15 years preceding the hearing. (Tr. at 1346)

The ALJ asked Leviton to consider a hypothetical individual of Morris' age, education level, and work history, who had a "sedentary level of exertion with all of the posturals occasional, except never climbing a ladder, rope or a scaffold, and medication side effects would limit [the individual] to simple, unskilled work, [and require that she] avoid concentrated exposure to extremes in cold and hazards." (Tr. at 1346-47) The ALJ instructed Leviton to assume that the above-described limitations would limit the clamant's past relevant work and asked whether there would be any simple, unskilled work that the hypothetical individual could perform. (Tr. at 1347) Leviton testified that this individual would be able to perform in the positions of: (1) "order clerk for food and beverage" (of which there were 20,000 jobs nationally and 2,000 locally in the Dover, Delaware area); (2) "addresser" (30,000 jobs nationally, 300 locally); and (3) "paper printed circuit boards" taper (over 56,000 jobs nationally, 300 locally). (*Id.*)

The ALJ next told Leviton to add the additional limitation that the person could only perform "frequent rather than constant" manipulation, handling and fingering, and that the person had "no vision in one eye so that this would be a person whom would need to turn their head to look on one side [and] probably should [not] have a great deal of reading fine print." (Tr. at 1348) Leviton testified that none of the three positions would be affected by the additional

21

handling limitations, but that the vision limitation would slightly reduce the amount of order clerk and addresser positions available and would reduce by half the number of the taper positions available. (Tr. at 1348-49)

Morris' attorney was then provided with an opportunity to question Leviton. He first asked whether, in Leviton's opinion, Morris would be able to perform any jobs in the economy if her testimony were found to be credible. (Tr. at 1350) Leviton responded that several of Morris' claimed limitations would preclude all employment. (*Id.*) Leviton also agreed that if Morris was unable to work eight hours in a day, if she missed two days of work per week, or if she missed more than one hour of work per day, then there would be no available work that she could perform. (Tr. at 1352-54) Lastly, Leviton agreed that if Morris could not lift anything more than a cup of soup, this would preclude all employment. (Tr. at 1354-55)

## b.    The Second Administrative Hearing

At the Second Administrative Hearing, the ALJ and Morris' attorney first discussed the two reasons why the Appeals Council had remanded the case, including the ALJ's need to assess how Dr. Falco's 2007 RFC opinion should impact the ALJ's findings. (Tr. at 1367-68) Morris' attorney asked the ALJ to specifically consider that Dr. Falco had written over 60 reports regarding Morris from 2000 to 2006, and noted that the reports were "consistent" and showed Morris was "having severe problems" throughout that time. (*Id.*) Morris then testified as to her health since the time of the prior hearing.

### i.    Ms. Morris' Testimony

With regard to her neck pain, Morris testified that at the time of the hearing, she was treating the pain with Fentanyl patches and oxycodone. (Tr. at 1372) She said that she had no


22

improvement with that pain, which was exacerbated by nerves that have gone bad, causing the pain to register as an eight on a scale of one to ten. (Tr. at 1373) Morris testified that she was able to turn her head from side to side and look up and down. (*Id*.)

As for her eye problems, Morris said that she was no longer seeking treatment or taking medication for her left eye, as "the damage [was] already done" and there was nothing further that the doctors could do. (*Id*.) The vision in her right eye was corrected with glasses, however, so she had a license to drive. (*Id*.)

Morris testified that she continued to have pain in her back, which she was treating with injections that helped on a temporary basis. (Tr. at 1374) With medication, she rated her back pain as about a seven or eight on a scale of one to ten. (*Id*.)

Morris testified that she still had carpal tunnel syndrome, which was more severe in the left hand than the right, and wore braces every night and for about two hours during the day. (Tr. at 1374-75) She testified that she was still unable to button or zipper her clothing, but could hold a knife and fork, a toothbrush or a pen, and could open doorknobs, car doors, and drive a car. (Tr. at 1375)

For her lupus, Morris testified she was treating with a Dr. Petri at Johns Hopkins instead of Dr. Javed. (*Id*.) She was taking Plaquenil, which was not helping with the pain, but was intended to prevent flare-ups. (Tr. at 1375-76) At first, Morris testified that the treatment was not working, but upon further questioning, she indicated it was about 70% effective. (Tr. at 1376)

For her knee pain, Morris testified that it was still severe, and ran down to her ankles. (Tr. at 1377) She said she wore knee braces constantly, which eased the pain somewhat. (*Id*.)

23

She had injections in both knees about two months before the hearing, which helped for about two days, but then the pain returned. (Tr. at 1376-77) She intended to start treatments again in the week following the hearing, and had been "waiting on the insurance." (Tr. at 1377)

Morris testified that she continued to have headaches about twice a month, which she treated with Advil. (*Id.*) She further testified that she continued to take medication for depression, as prescribed by her rheumatologist. (Tr. at 1378)

Morris testified that she had no negative side effects from her medication and that she was able to sit or stand for about half an hour. (*Id.*) She could lift "hardly anything at all" and not more than a pound. (Tr. at 1378-79) At the time of the hearing she was able to take care of her own personal hygiene, such as showering and getting dressed, but was still unable to do chores around the house. (Tr. at 1379) Morris was able to drive only for simple errands and make sandwiches or use the microwave, but was unable to do the grocery shopping or the laundry. (*Id.*)

## ii. The Vocational Expert's Testimony

Vocational Expert Jan Howard Reed testified at the Second Administrative Hearing. (Tr. at 1383) She first indicated that she agreed with the prior vocational expert's testimony that Morris' past relevant work as a waitress was light and semi-skilled. (*Id.*)

The ALJ then asked Reed to consider a hypothetical individual, age 44-45 at onset, with a high school education, who is able to perform at a sedentary level of exertion, with "the posturals [] all occasional, but there should not be climbing of a ladder, rope or a scaffolding. Working overhead is to be avoided [and the hypothetical individual] has visual limitations, near and far, acuity, depth perception, because there's very, very little vision in the left eye." (Tr. at 1383-84)

24

The ALJ added that the visual limitations would limit the individual to work that "does not require constant reading and writing or distance vision during the day." (Tr. at 1384) The person would also need to "avoid concentrated exposures to temperature extremes and vibration." (*Id.*) The ALJ questioned whether such a person would be able to perform Morris' past relevant work; Reed said no. (*Id.*) The ALJ next referred to the prior vocational expert's findings that such a person could work in three different jobs (order clerk, addresser and taper), even if an additional handling limitation of "frequent" rather than "constant" fingering and feeling were added. (*Id.*) Reed said that she agreed that such a person could work in these jobs. (*Id.*) Reed noted that all of the jobs required frequent (rather than constant) use of the hands. (*Id.*)

The ALJ next asked whether additional mental limitations—such as limitations that would require the work not be completed at a production pace, but instead at a "paid by the piece" or "working at an assembly line" type of pace—would impact Reed's conclusion that the person could perform these three jobs. (Tr. at 1385) Reed answered that it would not. (*Id.*)

Finally, Morris' attorney asked whether this hypothetical person would be able to perform the three jobs if the person's handling, fingering and feeling limitations were further reduced to "occasional," rather than "frequent." (*Id.*) Reed stated that if the person had these added limitations, she could not perform any of the three jobs. (*Id.*)

### 3. The ALJ's Findings

On October 21, 2009, the ALJ issued the following findings:[5]

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

---

[5]      (Tr. at 27-56)

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 31, 2002 through her date last insured of December 31, 2007 (20 C.F.R. 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: cervical degenerative disc disease and radiculopathy, vision loss, lupus, right trochanteric bursitis, osteoarthritis, lumbar degenerative disc disease, carpal tunnel syndrome, and depression[6] (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she could lift 10 pounds occasionally, less than 10 pounds frequently, stand or walk for 2 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or stairs, balancing, stooping, kneeling, crouching, and crawling but never climbing a ladder, rope or scaffold, avoiding overhead work, with no requirement for constant reading, writing or use of distance vision, and avoiding concentrated exposure to temperature extremes and vibration.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

---

[6] The ALJ found that Morris' complaints of irritable bowel syndrome and headaches did not amount to severe impairments under the law. (Tr. at 40-41)

7. The claimant was born on January 17, 1961 and was 46 years old, which is defined as a younger individual age 18-44 [*sic*], on the date last insured (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See Social Security Regulation ("SSR") 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 31, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 C.F.R. 404.1520(g)).

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. In determining the appropriateness of summary judgment, the Court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party,' but not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing*

27

*Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has explained that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal quotations and citation omitted). The United States Court of Appeals for the Third Circuit has also held that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). "Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.*

In analyzing whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d

28

Cir. 2001). Thus, the Court's inquiry is not whether the Court would have made the same determination as the Commissioner; instead, the question is whether the Commissioner's conclusion is reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

However, it is the ALJ's responsibility "'to analyze all the evidence and to provide adequate explanations when disregarding portions of it.'" *Guerrero v. Comm'r of Social Sec.*, Civ. Act. No. 05-1709 (FSH), 2006 WL 1722356, at *3 (D.N.J. June 19, 2006) (quoting *Snee v. Sec'y of Health and Human Serv.*, 660 F. Supp. 736, 739 (D.N.J. 1987)). "'[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Ed. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)). While there is no requirement that the ALJ discuss every piece of evidence in the record, as the fact finder, he or she is expected "to consider and evaluate the medical evidence in the record consistent with his [or her] responsibilities under the regulations and case law." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Ultimately, "the Court must set aside the Commissioner's decision if the Commissioner did not take the entire record into account or failed to resolve an evidentiary conflict." *Ongay v. Astrue*, Civil No. 09-610 RMB, 2010 WL 5463070, at *7 (D. Del. Dec. 29, 2010).

29

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Id.* at \*8. The Court's review of legal issues is plenary. *Id.*

## III.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that she was disabled prior to the date she was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

30

sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §
404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in
substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability
when claimant is engaged in substantial gainful activity). If the claimant is not engaged in
substantial gainful activity, step two requires the Commissioner to determine whether the
claimant is suffering from a severe impairment or a combination of impairments that is severe.
20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's
impairments are not severe). If the claimant's impairments are severe, then the Commissioner
proceeds to step three, and must compare the claimant's impairments to a list of impairments (the
"listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. §
404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent
matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §
404.1520(a)(4)(iii). If a claimant's impairment, either by itself or in combination, fails to meet or
medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. §
404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to
perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled
if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that
which an individual is still able to do despite the limitations caused by his or her impairment(s)."
*Johnson v. Comm'r of Social Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotations and
citations omitted). "The claimant bears the burden of demonstrating an inability to return to her

31

past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the
Commissioner to determine whether the claimant's impairments preclude her from adjusting to
any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when
the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is
on the Commissioner to show that the claimant is capable of performing other available work
before denying disability benefits. *Id.* In other words, the ALJ must show that "there are other
jobs existing in significant numbers in the national economy which the claimant can perform,
consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.*
When making this determination, the ALJ must analyze the cumulative effect of all of claimant's
impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.*

## B. Ms. Morris' Arguments On Appeal

On appeal, Morris presents three arguments: (1) the ALJ failed to properly weigh the
evidence, particularly in that the ALJ failed to follow the "treating physician" doctrine; (2) the
ALJ's RFC finding was deficient in that it failed to include a number of appropriate limitations;
and (3) the testimony of the vocational expert was deficient.

### 1. The ALJ's Weighing of Evidence

#### a. The Parties' Arguments

Morris first contends that the ALJ failed to properly weigh the medical evidence in this
case for a number of reasons, including that the ALJ: (1) failed to follow the regulations
regarding how the opinions of medical sources are to be weighed; (2) failed to give the opinion
of Morris' treating physician, Dr. Frank Falco, appropriate consideration and weight; (3) failed to

32

sufficiently explain her decision-making process and; (4) failed to consider all of the evidence.

(D.I. 15 at 7-13) For its part, the Commissioner argues that the ALJ gave thorough consideration to the entire record, appropriately weighed the medical evidence and provided an adequate basis for the Court to determine whether her decision was supported by substantial evidence. (D.I. 19 at 30-42)

### b. Discussion

#### i. The ALJ's Consideration of the Treating Physician's Opinion

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer,* 186 F.3d at 429); *see also Dougherty v. Astrue,* 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . .

20 C.F.R. § 404.1527(d)(2); *see also Fargnoli,* 247 F.3d at 43; *Ongay,* 2010 WL 5463070 at *9.

These regulations instruct that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p,

1996 WL 374188, at \*2 (July 2, 1996). After undertaking this analysis, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion. The ALJ must do so by considering the following factors: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, the degree to which the physician presents relevant medical evidence in support of the opinion, the consistency of the opinion with the record as a whole, the degree to which the opinion relates to an area in which the physician specializes, and any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d)(2)-(6); *Ongay*, 2010 WL 5463070 at \*9.

Where a treating physician's opinion conflicts with that of a non-treating, non-examining physician, an ALJ may choose whom to credit but "'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales*, 225 F.3d at 317.

Of the many physicians who offered an opinion as to Morris' RFC as part of the record in this case, only one had treated Morris during her period of claimed disability: Dr. Falco, her pain management physician.[7] Following seven years of regular visits with Morris, Dr. Falco issued

---

[7]     One other treating physician, Dr. Hermantin, did provide a written opinion regarding the Plaintiff's ability to work. However, Dr. Hermantin filled out this "Return to Work Recommendations" form in November 2002, before the claimed period of disability began. (Tr. at 266) The timing of Dr. Hermantin's opinion necessarily cabins the impact that it could have on the ALJ's review of Morris' health during the period of claimed disability, which dates from December 31, 2002 through December 31, 2007. For this reason, and for ease of reference, when this Report refers to Morris' "treating physician," it will refer only to Dr. Falco. Nevertheless,

34

his August 2007 RFC opinion, in which he concluded that Morris' symptoms rendered her incapable of performing any work—even sedentary work—on a regular and continuing basis. (Tr. at 33-35) Therefore, the manner in which the ALJ reviewed and considered Dr. Falco's opinion was very important. If after analyzing Dr. Falco's opinion in the manner required by law, the ALJ assigned it controlling weight, then a finding of disability would almost certainly have followed. Even if not assigned controlling weight, if Dr. Falco's opinion was given some significant amount of weight by the ALJ, that fact might well have altered the ultimate disability determination.

However, in the portion of the ALJ's decision setting forth an analysis of the medical record, the ALJ provided only the following mention[8] of Dr. Falco's 2007 opinion:

> The undersigned assigns little weight to Dr. Falco's opinion. Dr. Falco's opinion is not consistent with the medical record as a whole, as revealed in the previous discussion about the claimant's reported pain levels and each of her impairments in turn.

(Tr. at 53) Considering the near decade-long treatment relationship between Morris and Dr. Falco, as well as the over-500 page treatment record on which Dr. Falco's opinion was based, this two-sentence statement contains surprisingly little detail.[9]

This limited analysis is even more stark considering that, prior to the ALJ's decision, the

___

the discussion of the manner in which an ALJ should analyze a treating physician's opinion would apply to the opinion of any treating physician whose analysis is relevant to the ALJ's disposition, including that of Dr. Hermantin.

[8] In a prior section of the decision, the ALJ had summarized the contents of Dr. Falco's opinion, but had not provided any analysis of its merits, or of how the opinion compared to the existing medical record. (Tr. at 51)

[9] This analysis also contains far less detail than the ALJ's analysis of nearly every other medical opinion in the record. (Tr. at 53-54)

Appeals Council had remanded the case for two specific reasons—one of which was to order that the ALJ specifically assess Dr. Falco's opinion. In doing so, the Appeals Council had noted Dr. Falco's conclusion that Morris could not "work a 40 hour work week" and ordered the ALJ to "[g]ive consideration to the treating and nontreating source opinions," to "explain the weight given to such opinion evidence," and give "further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with references to evidence of record in support of the specific work-related limitations." (Tr. at 119-20) Indeed, at Morris' Second Administrative Hearing, Morris' attorney had emphasized with particularity that one of the primary reasons for the new hearing was so that the ALJ could analyze and assess Dr. Falco's opinion. (Tr. at 1367-68)

The Court finds that the ALJ's treatment of Dr. Falco's opinion amounted to legal error, in at least two different respects. First, the ALJ erred in failing to address or discuss any of the legal standards set forth above regarding the weight to be given to a treating physician's opinion. In deciding what weight to give Dr. Falco's opinion, the ALJ was required to first determine whether the opinion was entitled to controlling weight. If it was not, the ALJ was then required to apply the factors set forth in 20 C.F.R. § 404.1527(d), in order to determine what weight the opinion should be given. This Court has held that a "decision not to give a treating physician's opinion controlling weight must not automatically become a decision to give a treating physician's opinion no weight whatsoever." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). Moreover, Social Security regulations clearly direct that:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that

36

> the opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions are
> still entitled to deference and must be weighed using all of the
> factors provided in 20 CFR 404.1527 and 416.927. In many cases,
> a treating source's medical opinion will be entitled to the greatest
> weight and should be adopted, even if it does not meet the test for
> controlling weight.

SSR 96-2p, 1996 WL 374188, at *4; *see also Dougherty*, 715 F. Supp. 2d at 581; *Gonzalez*, 537

F. Supp. 2d at 660.

There is no indication in the ALJ's decision that she followed these directives. The ALJ

made no clear reference to the above-described standard regarding whether a treating physician's

medical opinion should be given controlling weight; indeed, during the ALJ's analysis of Dr.

Falco's opinion, she does not mention that Dr. Falco was a treating physician at all. (Tr. at 53)

Moreover, if (as it seems clear), the ALJ did not give Dr. Falco's opinion controlling weight, the

ALJ then also failed to discuss or mention any of the Section 404.1527(d) factors, such as Dr.

Falco's areas of specialization, or the length, frequency, nature or extent of his treating

relationship with Morris. These factors should have explicitly been considered in determining

what level of deference Dr. Falco's opinion was to receive. The lack of any mention of these

factors leads to the necessary conclusion that the ALJ did not consider them.[10] This was contrary

to the law.

Second, although the ALJ was entitled to reject a treating physician's opinion on the basis

of contradictory medical evidence, the ALJ was required to set forth that evidence in detail. Yet

---

[10]    At an earlier point in her decision, the ALJ stated "[t]he undersigned has also
considered the opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 . . .
." (Tr. at 43) But at no point in her decision did the ALJ explain *how* she had analyzed those
requirements in a way that could be subject to meaningful review.

37

the ALJ failed to do so. Instead, in deciding to give Dr. Falco's opinion "little weight," the ALJ said only that the opinion was not consistent "with the medical record as a whole," as revealed in the previous discussion about Morris' "reported pain levels" and "each of her impairments in turn." (Tr. at 53) However, the medical record in the case is voluminous, spanning nearly a decade, and the ALJ's 30-page decision contains a large number of references to Morris' reported pain levels and her many impairments. The ALJ's brief comments about Dr. Falco's opinion leaves the Court to guess as to: (1) what particular pain-related reports or impairments the ALJ was referring to; (2) the specific aspects of Dr. Falco's opinion the ALJ found wanting; and (3) how those aspects of Dr. Falco's opinion were contradicted by the relevant portions of the medical record.

These specific details have real relevance to the Court's ability to review an ALJ's decision. For example, earlier in the ALJ's decision, there were repeated indications that the ALJ found Morris less than credible as a witness. The ALJ found Morris' testimony about her pain levels at the Second Administrative Hearing not credible, in part because "the claimant's reported pain levels [at the time of the 2009 hearing] spiked after the undersigned issued the [ALJ's first unfavorable decision in August 2007] where a discussion of the claimant's reported pain levels figured prominently in the decision to deny benefits." (Tr. at 49) And the ALJ suggested that Morris' claims of severe pain at the 2009 hearing were undermined by Morris' allegedly prior contradictory reports about the extent of her pain on various medical forms from 2003 through 2005. (*Id.*) Yet the law is clear that while an ALJ may reject a treating physician's opinion due to the existence of contradictory medical evidence, the ALJ cannot reject that opinion based solely on the ALJ's own evaluation of a claimant's credibility. *Dougherty*, 715 F.

38

Supp. 2d at 583 (citing *Morales*, 225 F.3d at 318). When the ALJ rejected Dr. Falco's opinion by citing her "previous discussion about the claimant's reported pain levels," to the extent that this reference went solely to the ALJ's view of Morris' credibility, it would be an improper basis upon which to discount Dr. Falco's opinion. *See id.* But without knowing what the ALJ meant by the use of that phrase, the Court cannot meaningfully review the ALJ's decision in this regard.[11]

In addition, the specific reasons why the ALJ gave Dr. Falco's opinion "little weight" are also important because they affected the ALJ's view of at least one other physician's opinion: that of Dr. Scovern, the state agency physician who reviewed Dr. Palandjian's RFC opinion in January 2008. Dr. Scovern's opinion contained certain statements that can be viewed as supportive of Dr. Falco's opinion. For example, Dr. Scovern stated that given Morris' persistent allegations of pain since 2000, and Morris' consistent use of strong narcotics to treat that pain,

---

[11]     Similarly, at earlier points in the ALJ's decision, the ALJ seemed to place significant weight on the fact that Morris' individual impairments responded well to treatments at particular times and produced only sporadic (as opposed to persistent) pain. (Tr. at 44-46) Yet this Court has found that even if a treating physician's medical records show that a claimant obtained significant pain relief from medication, where the record also demonstrates the existence of physical impairments that cause the pain to return, requiring future procedures and heavy medication, then the earlier temporary relief will not necessarily render the treating physician's opinion inconsistent with the medical record. *Dougherty*, 715 F. Supp. 2d at 581-82; *see also Brownawell v. Comm'r of Social Sec.*, 554 F.3d 352, 356 (3d Cir. 2008) ("[A] doctor's observation that a patient is 'stable and well controlled with medication during treatment does not [necessarily] support the medical conclusion that [the patient] can return to work.'") (alterations in original) (internal quotation marks and citation omitted). Here, Dr. Falco's records are replete with discussion of his efforts to relieve Morris' pain, only to see those complaints repeatedly return and necessitate the use of significant medications, such as pain relievers (Lortab, Roxicodone, Lidoderm and Duragesic patches), as well as muscle relaxers (Skelaxin), and sleep aids (Ambien). (Tr. at 495, 1061, 1210) Yet, in largely rejecting Dr. Falco's opinion as "not consistent with the medical record as a whole," the ALJ did not say *why* it was so inconsistent. Without knowing what that rationale was, the Court cannot determine if it implicates the legal precedent in *Dougherty* and *Brownawell*.

Dr. Falco's disability opinion should be given "substantial weight according to program policy and guidelines." (Tr. at 1257) Dr. Scovern therefore "would have assigned a less-than-sedentary RFC." (*Id*.)[12] The ALJ, however, assigned "little weight" to Dr. Scovern's opinion (at least, insofar as the opinion approvingly cited Dr. Falco's conclusions). (Tr. at 54) Instead, the ALJ noted that Dr. Scovern's "opinion appears to rest solely on the claimant's subjective complaints of pain, which were assigned little credit above, and Dr. Falco's statement, which is assigned little weight." (*Id.*) However, since the ALJ did not provide a clear articulation as to *why* Dr. Falco's opinion was assigned little weight, the Court cannot fully understand the ALJ's rationale for, in turn, relatedly discounting Dr. Scovern's opinion.

The Commissioner argues to the contrary that although the ALJ's explanation for discounting Dr. Falco's opinion is "not as exhaustive as Morris would have preferred," it was sufficiently detailed under the law. (D.I. 19 at 31-33) In support of this position, the Commissioner cites *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981) (denial of sur petition for rehearing), for the proposition that an "ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." (*Id.*) Yet *Cotter* still recognized the need for an ALJ to "explain the basis for

---

[12]     In light of this finding, Morris asserts that Dr. Scovern "agreed with Dr. Falco." (D.I. 15 at 17) However, Dr. Scovern did also note that Dr. Palandjian's contrary opinion "cannot be considered patently incorrect." (Tr. at 1257) Because Dr. Scovern did not have the legal authority to substitute his judgment for that of Dr. Palandjian, Dr. Scovern therefore accepted Dr. Palandjian's RFC determination. (*Id.*) As a result of that acceptance, the Commissioner asserts that (contrary to Morris' conclusion) Dr. Scovern *did not* endorse Dr. Falco's opinion. (D.I. 19 at 45) A fair reading of Dr. Scovern's opinion shows that he indicated that the evidence could support either Dr. Falco's or Dr. Palandjian's conclusions, and that he provided commentary that was favorable as to each doctor's view. The ALJ, in giving Dr. Scovern's opinion "little weight," appears to have focused primarily on those portions of the opinion that were supportive of Dr. Falco's analysis. (Tr. at 54)

40

the decision to reject evidence which s/he has already made" and to provide explanations "adequate for the court to exercise its review function." *Id.* Moreover, this Court has held that even in light of *Cotter*, when an ALJ's decision does not contain sufficient detail to allow a reviewing Court to determine how or whether the ALJ applied the treating physician doctrine, the decision cannot stand. *Eskridge v. Astrue*, 569 F. Supp. 2d 424, 437 (D. Del. 2008) (citing *Cotter*, but remanding the ALJ's decision, because it was "unclear" to the Court whether the ALJ considered a treating physician's opinion, as the ALJ did not explain the reasons why the opinion was or was not adopted, the weight it was afforded, or how the factors set forth in 20 C.F.R. § 404.1527(d) applied to the opinion). Here the ALJ's failure to explicitly apply the applicable regulations regarding the weight to be given to a treating physician's opinion, combined with the ALJ's terse description as to why that opinion was given "little weight," were not sufficient to satisfy even *Cotter*'s limited requirements.

Instead, the ALJ's errors in this regard are much more in line with the facts in *Ongay v. Astrue*, Civil No. 09-0610 RMB, 2010 WL 5463070 (D. Del. Dec. 29, 2010). In *Ongay*, a case with very similar procedural circumstances to this one, the claimant argued that the ALJ erred by failing to assign the opinions of her treating physicians significant, if not controlling, weight. *Id.* at *9. This Court agreed, noting that despite the ALJ's conclusion that "'the opinions of the treating physicians in this case were not supported by sufficient objective evidence,'" the ALJ had not addressed the factors set forth in Section 404.1527(d) regarding the weight to be afforded those opinions. *Id.* at *10. The Court also found insufficient the ALJ's limited explanation as to why the treating physicians' opinions were rejected, as "the ALJ did not clearly identify what evidence, if any, she considered to be conflicting with [those opinions]." *Id.* Noting that the

41

treating physicians' opinions appeared to be well supported by medically acceptable clinical and

laboratory diagnostic techniques, the Court found that the opinions were entitled to at least some

deference by the ALJ. *Id.* In just the same way as in *Ongay*, here the ALJ did not sufficiently

consider or employ the treating physician doctrine.

## ii. The ALJ's Analysis of Non-Treating Physicians' Opinions

The ALJ also erred in failing to provide an adequate explanation regarding her decision to

assign certain weight to the opinions of non-treating physicians. "[Social Security] regulations

provide progressively more rigorous tests for weighing opinions as the ties between the source of

the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180, at *2 (July 2,

1996).

> For example, the opinions of physicians or psychologists who do
> not have a treatment relationship with the individual are weighed
> by stricter standards, based to a greater degree on medical
> evidence, qualifications, and explanations for the opinions, than are
> required of treating sources.

*Id.* Additionally, the regulations contain specific direction for treatment of the opinions of non-

examining sources:

> Generally, we give more weight to the opinion of a source who has
> examined you than to the opinion of a source who has not
> examined you. . . .
>
> [B]ecause nonexamining sources have no examining or treating
> relationship with you, the weight we will give their opinions will
> depend on the degree to which they provide supporting
> explanations for their opinions. We will evaluate the degree to
> which these opinions consider all of the pertinent evidence in your
> claim, including opinions of treating and other examining sources.

20 C.F.R. § 416.927(d)(1) & (3); *see also Gonzalez*, 537 F. Supp. 2d at 664. This Court has

42

emphasized that when a non-treating physician's opinion is rendered without the benefit of a complete record, this makes the scales tip even more in favor of the treating physician's opinion. *Dougherty*, 715 F. Supp. 2d at 583.

In this case, however, the ALJ assigned weight to various non-treating physician opinions without any explicit mention as to whether those opinions were based on an examination of Morris or simply upon a review of the record. (Tr. at 53-55) Even more significantly, in her analysis, the ALJ made almost no reference as to when the non-treating opinions had been rendered, or whether they took into account the opinions of other examining sources, including that of the treating physician, Dr. Falco.[13] (*Id.*)

For example, the ALJ gave "some weight" to portions of the opinions of two state agency physicians, Dr. Aldridge and Dr. Kataria, but in doing so, made no explicit mention of the fact that neither physician examined Morris. (Tr. at 54) Similarly, in her analysis of the weight to be accorded to Dr. Aldridge's and Dr. Kataria's opinions, the ALJ did not mention that the opinions were issued in September 2004 and May 2005 respectively—years before the record was complete and well before Dr. Falco provided his August 2007 opinion. (*Id.*) Indeed, Dr. Aldridge rendered her opinion before Morris was even diagnosed with lupus or carpal tunnel syndrome, and Dr. Kataria's opinion came only shortly after Morris was diagnosed with lupus and before she was seen for carpal tunnel syndrome.

The ALJ also gave "some weight" to the opinion of Dr. Archer, a state agency physician

---

[13]    Indeed, the only instance in which the ALJ referenced whether the opinion of a non-treating physician considered Dr. Falco's views was in the previously-referenced case of Dr. Scovern. In that case, the ALJ noted that Dr. Scovern had favorably referenced Dr. Falco's assessment. (Tr. at 54) Nevertheless, in part because the ALJ had assigned Dr. Falco's opinion little weight, the ALJ also assigned Dr. Scovern's opinion little weight. (*Id.*)

43

who did examine Morris. (Tr. at 53) Dr. Archer's opinion also pre-dated Dr. Falco's opinion, so Dr. Archer could not have given the treating physician's opinion any consideration. Furthermore, while Dr. Archer reported that Morris arrived at the exam "with some limited medical records," there is no additional information regarding exactly what those records were, or what records Dr. Archer considered in his analysis. (Tr. at 825)

Similarly, the ALJ gave "some weight" to the opinion of state agency physician Dr. Palandjian. (Tr. at 54) Dr. Palandjian did have the benefit of Dr. Falco's opinion, and noted that Dr. Falco's conclusions were significantly different from his own. (Tr. at 1233) However, Dr. Palandjian's only explanation as to why Dr. Falco's conclusions were not supported by the evidence was as follows: "Dr. Falco–8/08–[Claimant] not capable of even sedentary work, cannot sit, stand or [walk] for more than ½ to 1 hour at a time—opinion is reserved for the commissioner." (*Id.*) While Dr. Palandjian's opinion did note that Dr. Falco's most recent exam revealed that Morris exhibited preserved motor strength and normal gait, which meant that "claimant should be capable of sustaining light activity with visual/hazard restrictions[,]" (Tr. at 1234), none of this was mentioned by the ALJ in her discussion of the weight to be assigned to Dr. Palandjian's opinion. (Tr. at 54)

The ALJ's failure to analyze whether these non-treating physicians rendered their opinions without the benefit of a complete record, or whether they took into account the conclusions of the treating physicians, was also error. *See Morales*, 225 F.3d at 319-20 (finding ALJ's disability determination to be error, in part because the ALJ relied on the opinion of a physician who had not examined claimant and had not considered opinions of other physicians, including a treating physician); *Dougherty*, 715 F. Supp. 2d at 583 (finding that ALJ erred in

44

rejecting treating physician's opinion as contradictory to the opinion of a non-treating physician, where the non-treating physician's opinion was rendered without having examined claimant, well before record was complete, and before a significant number of claimant's important hospitalizations and treatments); *Gonzalez*, 537 F. Supp. 2d at 664 (finding error in ALJ's decision to give more weight to the opinions of non-treating physicians than to the treating physicians, where non-treating physicians did not consider the treating physicians' views).

### iii. The Appropriate Remedy in Light of the ALJ's Errors in Considering the Treating and Non-Treating Physicians' Opinions

Morris argues that Dr. Falco's opinion and the record as a whole supports a finding of disability. In light of the state of the record, the length of time that Morris' application has been pending and Morris' financial situation, she asserts that the Court should vacate the ALJ's decision and simply enter an order for an award of benefits, rather than remand for further proceedings. (D.I. 15 at 16-18; D.I. 22 at 9-10) The Third Circuit has held that a district court's decision to direct benefits where an ALJ has committed error "should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

The Court is mindful of the Plaintiff's concerns. The length of time that has passed since the Plaintiff's first application for benefits is great, and this would be the second time that this case has been remanded with instructions that the ALJ should analyze the weight to be given Dr. Falco's opinion. Again, however, this Court's opinion in *Ongay* is instructive. In that case, the claimant asked this Court to direct an award of benefits in her favor, in light of the Court's

45

findings that the ALJ had erred in similar respects to the errors at issue here. However, this Court declined Ongay's request, noting that the case was not one "where undisputed evidence supports an award of benefits"; instead, it was one where "the record reflect[ed] conflicting opinions regarding Plaintiff's ability to perform . . . work." *Ongay*, 2010 WL 5463070 at *11. Although noting the "lengthy record that ha[d] developed in [that] case," this Court remanded the matter "to permit the ALJ to either credit the opinions of Plaintiff's treating physicians or provide an adequate explanation for rejecting these opinions." *Id*. *Ongay* explained that a court could not "fulfill its duty of review absent sufficient explanation of the ALJ's credibility determinations with regard to the medical opinions in the record." *Id*.

As in *Ongay*, here the factual record is lengthy and complex, spanning years of Morris' medical history. Although Dr. Falco's opinion is clear and is the product of a lengthy treating relationship with Morris, there are a number of factors that must be considered in the weighing of a treating physician's opinion, and those factors have never been explicitly considered by an ALJ in the history of this case. Moreover, the entire medical record is not one-sided. A number of the non-treating physicians who examined Morris did, in many respects, come to conclusions that differ significantly from Dr. Falco's opinion. In such a situation, the fact finder is truly in the best position to conduct the type of review that is required. For this reason, I recommend that the case be remanded so that the ALJ is given one further opportunity to engage in this review process.

## 2. Morris' Remaining Arguments

Morris raises two more arguments in her appeal: (1) that the RFC finding was deficient in that it failed to include certain established limitations; and (2) that the testimony of the vocational

46

expert was deficient for similar reasons. Specifically, Morris argues that the ALJ failed to incorporate appropriate limitations into her RFC (and in the hypothetical question posed to the vocational expert) regarding: (1) Morris' ability to reach; (2) her handling and fingering ability; (3) her visual ability; and (4) her mental state. (D.I. 15 at 11-16) The Commissioner disagrees, arguing that all limitations that were actually established were included in both the RFC and in the hypothetical provided to the expert.

Because the Court recommends that this matter be remanded, it is very possible that, on remand, the ALJ may reach different conclusions as to Morris' impairments and Morris' RFC. The ALJ may again consult a vocational expert, who may in turn reach different conclusions than did prior experts in this case, depending upon the nature of the questions asked of that expert. In light of this, and due to the mixed state of the record as to some of Morris' remaining claims, an analysis of those claims would be largely superfluous at this stage. *See Gonzalez*, 537 F. Supp. 2d at 666.

However, the record is sufficiently clear for the Court to conclude that the ALJ erred in one additional respect: with regard to Morris' reaching limitations, and the impact they would have on Morris' ability to work. Nearly every physician who provided an RFC opinion in this case, and who specifically addressed the issue, found that Morris was limited to no more than occasional reaching in a job setting. For example, Dr. Aldridge's September 2004 opinion found that Morris could perform only "limited" "reaching all directions (including overhead)." (Tr. at 301) Dr. Archer's May 2007 opinion found that Morris was limited to "occasionally" reaching (meaning that she had the ability to reach from very little of the time "up to 1/3" of the time) in a job environment, both as to "Overhead" reaching and "All Other" types of reaching. (Tr. at 829)

47

Dr. Falco's August 2007 opinion stated that Morris could only "rarely" perform activities involving "reaching (including overhead)," meaning that she could only do so from 1% to 5% of the time. (Tr. at 834) And Dr. Palandjian's November 2007 opinion found that Morris was "limited" in her ability to reach "in all directions (including overhead)," and further explained that Morris could reach "occasional[ly] but not frequently nor continuous[ly]" due to her prior "cervical fusion" surgery in late 2002. (Tr. at 1231)

These consistent findings, spanning nearly the entire term of Morris' period of claimed disability, are strongly supported by the medical evidence. From as far back as October of 2000, when she first visited Dr. Falco's practice, the medical records reflect that Morris persistently complained of neck and bilateral arm pain. (Tr. at 606-07) Throughout 2001 and 2002, the pain was initially treated with several nerve root blocks and trigger point injections; when those treatments failed to provide long-term relief from pain, the cervical fusion surgery was performed in late 2002. (Tr. at 418, 432, 461-62) Morris continued to report pain consistently following the surgery and, in 2003, one of her physicians noted that she did not feel that there were any other procedures that would likely help Morris and that Morris should just continue with chronic pain management. (Tr. at 399, 410) From that point on, Morris treated the pain with narcotic pain killers, such as Lortab, Percocet, and Duragesic patches. (Tr. at 787, 1204) A consultative examination by Dr. Archer in May of 2007 revealed that Morris continued to have difficulty lifting her arms above shoulder height and complained of pain with some movements at that time. (Tr. at 826)

Indeed, at various places in the ALJ's decision, it appears that *the ALJ* concluded that Morris could not engage in more than occasional reaching in a job setting. For example, in the

48

portion of her opinion where the ALJ explained her analysis of the opinions of these various physicians, she said that she "assigns weight to Dr. Archer's opinion that the claimant could occasionally reach. . . ." (Tr. at 53) The ALJ also approvingly "assign[ed] weight to Dr. Palandjian's opinion that the claimant . . . [had] a limited ability to reach in all directions. . . ." (Tr. at 54) And the ALJ also "assign[ed] weight to Dr. Aldridge's opinion that the claimant . . . [had] a limited ability to reach in all directions." (*Id.*) At no point in her analysis of these opinions did the ALJ indicate that she believed Morris had the ability to engage in more than occasional reaching in a job setting.

Yet although the ALJ appeared to agree with these physicians' conclusions as to Morris' reaching ability, it is unclear how (or to what degree) the ALJ imported this limitation into her hypothetical question to the vocational expert, or into her RFC determination. Morris asserts that the ALJ included *no* reaching limitations in her hypothetical or her RFC finding. (D.I. 15 at 11) The Commissioner disagrees, noting that Morris' RFC included the limitation that she could "never climb[] a ladder, rope or scaffold" and would need to "avoid[] overhead work," (Tr. at 43), and that the ALJ's hypothetical question to the expert included a similar limitation (Tr. at 1384) ("[T]here should be no[] climbing of a ladder, rope or scaffolding. Working overhead is to be avoided."). (D.I. 19 at 35) The Commissioner suggests that these limitations had to do with Morris' ability to reach and were meant to capture the ALJ's views as to such limitations. (*Id.*)

To the extent that the ALJ determined that Morris could perform no more than occasional reaching in the manner described by the physicians listed above, the content of her RFC determination (and of the hypothetical question posed to the expert) did not sufficiently capture that limitation. The ability to climb a ladder, rope, or scaffold is listed as a "postural limitation"

in the physical RFC forms filled out by many of the physicians in this case. This is a separate category from the "manipulative limitation" category on these forms—the category that specifically includes limitations on reaching—where one would look to discern the full measure of a claimant's ability to reach. (*See, e.g.*, Tr. at 300-01, 828-30) In addition, while the inability to work "overhead" certainly implicates a reaching limitation, Drs. Aldridge, Archer, Falco and Palandjian all found Morris to be limited to no more than occasional reaching—not just overhead, but also in all other directions.[14] (Tr. at 301, 829, 834, 1231) If the ALJ meant to fully credit those physicians' opinions as to this issue, then the limitation to "avoiding overhead work" was not sufficient to do so.

On the other hand, to the extent that, as the Commissioner argues (D.I. 19 at 35), the ALJ intended her RFC determination and hypothetical question to convey a finding that Morris could reach on *more* than an occasional basis, I find that there was not substantial evidence in the record to support that conclusion. First, as noted above, such a conclusion seems inapposite from the way the ALJ appeared to credit the contrary opinions of Drs. Aldridge, Archer and Palandjian on this very issue.[15] Second, the medical record evidence, as set forth above, cannot support a

---

[14] Each of these physicians specifically found that Morris' reaching ability was so limited, both as to overhead reaching *and* to all other reaching. *Cf. Kelley v. Astrue*, Civ. No. 10-323-LPS, 2011 WL 6310467, at *11-12 (D. Del. Dec. 16, 2011) (finding that physician had concluded that claimant's reaching ability was limited only as to overhead reaching, not all types of reaching, because physician had specifically written on the medical form that the reaching limitation was cabined in this way).

[15] The Commissioner suggests that the fact that the ALJ assigned "weight" to the opinion of these physicians as to the reaching limitation "does not mean she fully endorsed" those opinions. (D.I. 19 at 35) However, in the respective portions of the ALJ's decision, the ALJ gives no indication that she disagreed in any way with these physicians' conclusions as to reaching, or that she was not "fully endors[ing]" them. (Tr. at 53-54) If the ALJ meant to only agree with a part of the reaching limitations adduced by these physicians, she would have to give some clear indication of that in her decision, in order to allow for meaningful appellate review of

50

reasonable conclusion that Morris could engage in more than occasional reaching. Such a conclusion would clearly contravene not only the opinion of Morris' treating physician, Dr. Falco, but also the opinions of three of the other four physicians to offer an RFC opinion as to Morris' physical limitations during the period of disability.

In arguing to the contrary—that there is substantial evidence to support a conclusion that Morris could reach more than occasionally—the Commissioner cites three categories of evidence: (1) the November 2002 opinion of Dr. Hermantin and the May 2005 opinion of Dr. Kataria, both of which imposed no reaching restrictions; (2) certain findings of Dr. Javed, Morris' rheumatologist; and (3) the fact that Morris was able to vacuum and drive during the period of disability. (D.I. 19 at 35) For the reasons set forth below, the impact of these evidentiary citations, taken individually or together, is extremely limited. They are overwhelmed by the evidence discussed above, which clearly demonstrates that Morris was limited to no more than occasional reaching.

For example, with respect to Dr. Hermantin's opinion, it was issued before the period of disability began, and therefore could not take into account any of the developments in Morris' health over the next five years, nor any of the other opinions of Morris' physicians issued during that time. Dr. Kataria's opinion was also issued well before the close of the period of disability. Moreover, the ALJ assigned "little weight" to nearly all of Dr. Kataria's recommended limitations (including the ability to reach) because "Dr. Kataria did not consider the claimant's

_____

that issue. *See, e.g., Fargnoli*, 247 F.3d at 43 ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence."). The ALJ did not do so here, which strongly suggests that she fully agreed with these conclusions.

51

subjective complaints of pain." (Tr. at 54) It would seem incongruous for the Commissioner to cite Dr. Kataria's opinion on Morris' reaching ability as a factor supporting its argument, when the ALJ herself largely discounted the significance of this portion of Dr. Kataria's opinion.

With regard to Dr. Javed, the Commissioner cites to her reports of Morris' visits in July 2004, September 2005 and February 2006, each of which indicate that Morris had no restricted range of motion as to the cervical spine or shoulders. (D.I. 19 at 35) Yet Morris also repeatedly complained to Dr. Javed of pain in her neck, back and joints. (Tr. at 343, 345, 627, 1119) Moreover, none of Dr. Javed's reports cited by the Commissioner comment directly on Morris' ability to reach, nor did Dr. Javed otherwise provide an opinion on that issue.

Lastly, as to Morris' ability to vacuum or drive a car, Morris testified that in light of her pain, she could do almost no household chores, including vacuuming. (Tr. at 1329-30, 1379) She also stated that her ability to drive a car was limited to simple errands such as driving to a drugstore located across the street from her home. (Tr. at 1329-30) Indeed, the very portions of the record cited by the Commissioner—presumably to demonstrate that in light of Morris' ability to perform these everyday tasks, Morris must have been able to do more than occasional reaching—do not support a conclusion that Morris had the ability to reach with ease. To the contrary, these citations underscore Morris' claimed limitations with regard to these and other everyday chores, in line with much of the rest of Morris' testimony at her disability hearings.[16]

---

[16] For example, for the proposition that "[t]he record shows that Morris vacuumed," the Commissioner cites to notes from Morris' March 2003 visit to Dr. Smith, in which Dr. Smith writes that Morris "still has difficulty doing chores such as . . . vacuuming." (Tr. at 409 (cited in D.I. 19 at 35)) For the proposition that Morris "continued to drive" during the period of disability, the Commissioner cites to notes from Morris' May 2007 visit to Dr. Archer, in which Dr. Archer writes "[s]he is able to drive, but she states she only does this short distances and I do not have the equipment to test her eyesight, and so that would need to be taken into account in

52

Ultimately, the limitations on Morris' reaching ability have real significance as to the ALJ's finding of non-disability. As Morris notes (and the Commissioner does not dispute), all three of the jobs identified by the vocational experts and the ALJ—order clerk, addresser, and circuit board taper—require the employee to perform more than occasional reaching. (D. I. 15 at 14; D.I. 22 at 8-9 n.3) The Dictionary of Occupational Titles states that these jobs require that the employee be able to reach "frequently," meaning that the employee can reach from 1/3 to 2/3 of the time while performing the job. (*Id.*); *see also* Dictionary of Occupational Titles ("DOT") (4th ed. 1991), 209.567-014, 1991 WL 671794; (order clerk); DOT 017.684-010, 1991 WL 646421 (circuit board taper); DOT 209.587-010, 1991 WL 671797 (addresser). Since there is not substantial evidence in the record to support a finding that Morris can reach on a more than occasional basis, this means that the record cannot support a finding that Morris can perform any of the three jobs identified by the ALJ (and the vocational expert) as supporting a denial of benefits. *Davis v. Astrue*, 741 F. Supp. 2d 582, 590 (D. Del. 2010). Upon remand, the ALJ should incorporate the Court's decision in this regard into her disability analysis. *Id.*

## III. CONCLUSION

For the foregoing reasons, the Court recommends that the District Court (1) GRANT-IN-PART Plaintiff's motion for summary judgment; (2) DENY the Commissioner's motion for summary judgment without prejudice; (3) vacate the ALJ's decision; and (4) remand this matter to the ALJ for further proceedings consistent with this opinion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

terms of her ability." (Tr. at 826 (cited in D.I. 19 at 35))

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, http://www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: March 9, 2012

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE